United States District Court
Southern District of Texas
**ENTERED**
September 14, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:14-CR-00050-1 |
| | § | |
| KINDY STEVEN ROMERO-MEDRANO | § | |

## MEMORANDUM & ORDER

Before the Court is the Motion to Suppress filed by Defendant Kindy Steven Romero-Medrano. (Doc. No. 74.) Having considered the motion, response, testimony from the hearing on August 24, 2016, and applicable law, the Court finds that the motion must be granted.

### I.     BACKGROUND

Defendant has been charged with possession and distribution of child pornography. He seeks to suppress statements elicited during initial questioning by two agents from the Federal Bureau of Investigations (FBI) on July 19, 2013. Mr. Romero-Medrano argues the statements should be suppressed because he was in custody at the time of questioning, and he did not waive his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966).

On the morning of July 19, 2013, a team of 15 armed law enforcement officers executed a federal search warrant at Mr. Romero-Medrano's apartment. (Government's Response to Defendant's Motion to Suppress Evidence, Doc. No. 80 at 2.) When the officer entry team arrived at the apartment, the defendant's mother Erma Medrano ("Ms. Medrano") answered the door. (Transcript from Hearing on August 24, 2016 ("Hearing") at 12.) The officers secured the apartment and removed all residents: Mr. Romero-Medrano, his mother, father and two brothers. Mr. Romero-Medrano was asleep at the time the agents arrived. (Hearing at 18.) He was wearing his pajamas and was barefoot when he was taken outside the apartment. (Doc. No. 74.)

1

Mr. Romero-Medrano and his relatives remained outside the apartment while officers inspected the premises. As agents searched inside the apartment, at least one officer remained with each family member. (Hearing at 70, 72, 74.) The family members were not permitted to speak to one another. Ms. Medrano was allowed to return to the apartment to obtain medicine for her husband only after several requests and with an officer. (Hearing at 73.)

Mr. Romero-Medrano was the last member of the family to leave the apartment, and he was taken to the end of the apartment complex parking lot. (Hearing at 73-74.) There, Special Agent Robert Guerra and Task Force Officer John Barnes questioned Mr. Romero-Medrano in their patrol vehicle for 54 minutes. (Hearing at 21.) Agent Guerra told Mr. Romero-Medrano that he was not under arrest; Mr. Romero-Medrano was not handcuffed. (Transcript from FBI Interview on July 19, 2013 ("FBI Int.") at 1; Hearing at 19.) At the beginning of the interview, Agent Guerra informed Mr. Romero-Medrano of his *Miranda* rights. (FBI Int. at 2.) While Agent Guerra recited the warning, Mr. Romero-Medrano "was nodding his head and making gestures to Agent Guerra that Agent Guerra understood to mean 'hurry it along'." (Doc. No 80 at 3.) "Agent Guerra did not ask [the Defendant] if he understood those rights . . . . [and] did not ask the Defendant if he wished to waive his rights. No forms were signed." (Doc. No. 74.) At no point did Mr. Romero-Medrano explicitly waive his *Miranda* rights. (*See* FBI Int.) After the interview ended, the agents "ordered [Mr. Romero-Medrano] to stand outside the patrol vehicle near the officers who were guarding the perimeter of the apartment." (Doc. No. 74 at 2.)

Mr. Romero-Medrano contends that this 54-minute conversation was a custodial interrogation and that he did not knowingly or voluntarily waive his rights under *Miranda*.

2

## II. <u>LEGAL STANDARD</u>

"Burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). A defendant must demonstrate that the statements he seeks to suppress were obtained while he was under custodial interrogation. *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984) (overruled on other grounds by *U.S. v. Bengivenga*, 845 F.2d 593 (5th Circ. 1988) (en banc)). If the Court finds that the statement occurred during a custodial interrogation, then the burden shifts to the prosecution to prove a valid waiver occurred. The prosecution must "establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement" for it to be admissible. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010).

## III. <u>DISCUSSION</u>

### A. The Defendant was in custody at the time he gave his statement to law enforcement.

A suspect is "in custody" for purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.1988) (en banc) (adding that "the reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances"); *see also Stansbury v. California,* 511 U.S. 318, 324 (1994) ("the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"); *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006).

The Fifth Circuit identified factors relevant to the custody inquiry in *United States v. Wright*, 777 F.3d 769 (5th Cir.), *cert. denied,* 135 S. Ct. 2821, 192 L. Ed. 2d 860 (2015). *Wright* factors include: (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory nature of the questioning; (4) the amount of restraint on the individual's physical movement; (5) and statements made by officers regarding the individual's freedom to move or leave. *Wright*, 777 F.3d at 775. No one fact is determinative. *Id.* Considering the *Wright* factors, the Court finds that Mr. Romero-Medrano was in custody at the time he made his statement to the agents. The Court will consider each factor in turn.

*Length of time.* Agent Guerra and Officer Barnes questioned the Defendant for 54 minutes. (Hearing at 21.) Fourth Amendment jurisprudence has set no constitutional time limit for questioning a detainee before triggering *Miranda*. *See United States v. Harrell*, 894 F.2d 120, 124 (5th Cir. 1990). However, detention of a defendant for "approximately an hour raises considerable suspicion." *Id.* n.1. Mr. Romero-Medrano's nearly hour-long interview does not alone constitute custodial interrogation; it is "one, albeit important, factor to consider." *Id.*

*Location of questioning.* The interview occurred in the vehicle of Agent Guerra and Officer Barnes in the apartment complex parking lot. Mr. Romero-Medrano's family members could see but not hear the conversation between him and the officers. (Hearing at 75.) Agent Guerra informed Mr. Romero-Medrano that they would not be driving anywhere. (FBI Int. at 1.)

The Fifth Circuit has contrasted stationhouse interrogations with traffic stop or checkpoint questioning, and focused on the element of surprise to the accused. *See Bengivenga*, 845 F.2d at 599. Courts have found a reasonable person less likely to perceive restraint when he arrives at an anticipated law enforcement checkpoint. *See, e.g., United States v. Harrell,* 894 F.2d 120, 123–24 (5th Cir. 1990) ("law enforcement presence at a fixed checkpoint actually

4

assuages the reasonable person's perception of restraint"). In contrast, a person would more reasonably think he is restrained when he was woken in his own home and separated from his family to be questioned. *See United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012). Mr. Romero-Medrano's vehicle interrogation can reasonably be viewed as worse than either. It is more public than an isolated room, but much more surprising than a routine stop or a scheduled interrogation at a law enforcement office. A person who had just been awoken by law enforcement officers, removed from his home in pajamas and barefoot, and taken for questioning in a police vehicle could reasonably believe that he was not free to leave the interrogation.

*Nature of the questioning.* Courts have linked a defendant's reasonable conclusions that he is not free to leave to an officer's accusatory nature of questioning. *See, e.g., United States v. Bengivenga*, 845 F.2d at 597, n.16 ("The *awareness* of the person being questioned by an officer that he has become the focal point of the investigation, or that the police already have ample cause to arrest him, may well lead him *to conclude, as a reasonable person,* that he is not free to leave"); *United States v. Chavira,* 614 F.3d 127, 133–34 (5th Cir.2010) (emphasizing that officers told defendant that "they knew she was not telling the truth"). The FBI agents indicated to Mr. Romero-Medrano that he was the focal point of their investigation and that they knew he had committed a crime. (FBI Int. at 12, 15.) Two moments in the interrogation exemplify the accusatory nature of the agents' interrogation:

> RG [Agent Guerra]: So, look let me tell how this works too. So, after we talk to you, we then contact our, our attorney.
> KY [Defendant]: Ok.
> RG: And we say ok, you know what we made entry of the house, we found the computer. Ah, first question she's gonna ask is, Was he cooperative?
> KY: Oh, I see.
> RG: And ah, you know, I'm gonna have to tell her, you know, where you're, you're trying to play games with us as far as acting like you don't know how WIRESTACK works? (FBI Int. at 12.)

5

> OB [Officer Barnes]: … Because if you're an attorney, right and you're looking at jee-wiz I wonder how I should handle this guy. Is the guy you know, ah, aha, ah an absolutely predator or is he just someone that got interested in pornography and got off into this child pornography stuff. Those are two very different people and the only way we can determine, the only way the attorneys can determine, what type of guy you are, is if you tell us. So, we're not here to, to wonder whether or not ah, there's been a crime committed, that's happened. Ok, so I, I think, I think what you're having a problem with, is, is maybe thinking unh, I'll, I'll you know, jee-wiz I wonder if you know ah, it's, it's a crime. (FBI Int. at 15.)

Agent Guerra and Officer Barnes told Mr. Romero-Medrano they knew a crime had been committed, and they advised him to tell the truth about his involvement. Following the logic in *Bengivenga* and *Chavria*—that accusatory questioning may lead a person to think he cannot leave the interrogation—Mr. Romero-Medrano could have reasonably believed that he was restrained.

*Amount of restraint on individual's physical movement.* Members of the entry team removed all five of the Romero-Medrano family members from the apartment and the perimeter team then interviewed each person. (Hearing at 17.) When Mr. Romero-Medrano came downstairs from the second floor of the apartment complex, he was told not to speak to his mother and was taken to the side of the parking lot opposite where his mother stood. (Hearing at 73-74.) Agents Guerra and Barnes seated Mr. Romero-Medrano in their vehicle. (Hearing at 19.)

At the commencement of the interview, Agent Guerra told Mr. Romero-Medrano that he did not need to wear his seatbelt, as they were "not going anywhere" and Agent Guerra did not put handcuffs on him. (FBI Int. at 1). After completing the 54-minute interview, Agent Guerra told Mr. Romero-Medrano that "this is our scene until we leave." (FBI Int. at 60.) He asked Mr. Romero-Medrano "to stand in one place," estimating that the agents would be on the premises for another hour. *Id.* Had Mr. Romero-Medrano wanted to procure his shoes from inside the apartment, an agent would have escorted him inside to get his them. (Hearing at 23, 62.)

6

The facts before us parallel those in *United States v. Cavazos*, 668 F.3d 190 (5th Cir. 2012). Like Casavos, Mr. Romero-Medrano was awoken in his bedroom by the officer entry team, prohibited from talking with his family members, and told to remain in one place after the interrogation finished. He would not have been able to enter the apartment without a law enforcement escort. Just as Casavos' circumstances "would lead a reasonable person to believe that he was not at liberty to terminate the interrogation and leave, notwithstanding the fact that the interrogation occurred in his home and he was informed the interrogation was non-custodial," Mr. Romero-Medrano could have reasonably believed that he was unable to terminate the interrogation. *Cavazos*, 668 F.3d at 194.

*Statements made regarding individual's freedom to leave.* The Fifth Circuit has found that defendants were not in custody when they were told that they were not under arrest and were free to leave. *See United States v. Collins*, 972 F.2d 1385, 1405 (5th Cir. 1992). Mr. Romero-Medrano was told he was not under arrest; he was not told that he could leave. As already noted, Agent Guerra told Mr. Romero-Medrano at the end of the interview that he should stand in one place. (FBI Int. at 60.) Agent Guerra's statements would indicate to a reasonable person that he was not free to depart from the area after questioning was completed, let alone to leave during the interview in the vehicle.

Based on the *Wright* factors—especially the accusatory nature of the questioning and restraint on Mr. Romero-Medrano's movement—the Court finds that Mr. Romero-Medrano was in custody for the purposes of *Miranda*.

### B. The Defendant did not waive his *Miranda* rights before giving his statement to law enforcement.

The Government bears the burden of showing the Defendant voluntarily waived his *Miranda* rights. "Even absent the accused's invocation of the right to remain silent, the accused's

7

statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement." *Thompkins*, 560 U.S. at 382. A defendant's valid waiver requires his "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005). The Government bears the burden of "showing that the accused understood these rights." *Thompkins,* 560 U.S. at 384. The Court finds that the Government failed to show that Mr. Romero-Medrano understood his *Miranda* rights and voluntarily waived them.

Mr. Romero-Medrano never explicitly waived his *Miranda* rights. However, a waiver of *Miranda* rights may be implied and can be "less formal than a typical waiver on the record in a courtroom." *Thompkins,* 560 U.S. at 385. That said, a court will "not presume acquiescence in the loss of fundamental rights. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938). Determination of wavier requires a fact-specific inquiry into the background, experience and conduct of the accused. *See id*.

The Government fails to show that Mr. Romero-Medrano understood his rights. According to the Government, Mr. Romero-Medrano indicated understanding and acquiescence to Agent Guerra's recitation of *Miranda* rights because he "nodded his head and made gestures to the agent indicating that he understood his rights and to 'hurry it up'," "would cut the agents off and ask for the question without an explanation," and never requested to speak with an attorney or tried to end the interrogation. (Doc. No. 80 at 13.) As the audiotape and transcript of the interrogation does not include non-verbal signals, the Court must rely on Agent Guerra's testimony regarding the inferences he made from Mr. Romero-Medrano's conduct. The Court is

unpersuaded that Mr. Romero-Medrano's hand and head movements, if any, indicated understanding or agreement.

Mr. Romero-Medrano did not have an opportunity to ask questions or make objections before the questioning began. (FBI Int. at 2.) Agent Guerra never asked whether, and Mr. Romero-Medrano never stated that, he understood the *Miranda* rights. Mr. Romero-Medrano's reply of "unh-huh," is the only oral response he gave. (FBI Int. at 2.) Agent Guerra then added information about appointment of an attorney, and proceeded immediately to question Mr. Romero-Medrano. (FBI Int. at 2.)

> RG [Agent Guerra]: Ah, You have the right to remain silent; anything you say can be used against you in court. You have the right to talk to attorney for advice, before we ask you any questions.
> KY [Defendant]: Unh-huh.
> RG: You have the right to attorney, whe- you have the right to have an attorney with you during questioning. Ah, if you can't afford a lawyer one will be appointed for you. Ah, if you decide to answer questions now without a lawyer present, you have the right to stop anytime. Ah, How long have you lived here? (FBI Int. at 2.)

The agents left no time for Mr. Romero-Medrano expressly to waive his *Miranda* rights, to refuse to speak, or to clarify his understanding of the rights.

Other moments during the interrogation indicate Mr. Romero-Medrano did not understand what he was being asked. One moment in the interview illustrates Mr. Romero-Medrano's confusion:

> KY [Defendant]: Yeah, there's no point in this. Ok, What am I looking at?
> RG [Agent Guerra]: Four.
> KY: Four years.
> RG: No, For what? What are you looking at for what? You mean [overlapping].
> OB [Officer Barnes]: For the pictures? (FBI Int. at 15.)

Mr. Romero-Medrano's responses suggest that he thought he was already being charged with a crime, rather than being the subject of an investigation. Although understanding an

9

agent's questions is distinct from understanding *Miranda* rights, the conversation exemplifies Mr. Romero-Medrano's confusion about the nature of the interview.

Mr. Romero-Medrano's statements and conduct did not confirm that he understood what his *Miranda* rights were or what the consequences of waiving those rights would be. Agent Guerra's immediate transition from *Miranda* warnings to interrogation did not provide an opportunity for Mr. Romero-Medrano to clarify the warning. Mr. Romero-Medrano's confusion throughout the interview casts doubt on his full understanding of the *Miranda* rights. The Government has failed to show that Mr. Romero-Medrano waived his rights under *Miranda.*

### IV. CONCLUSION

For the foregoing reasons, Mr. Romero-Medrano's Motion to Suppress statements from the interrogation on July 19, 2013 (Doc. No. 74) is **GRANTED.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this 14th day of September, 2016.

*[signature]*

HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE